RESOLUTION TRUST CORPORATION, as Receiver for Peoples Savings and Loan Association, F.A., Plaintiff-Appellee,

v.

Angelo RUGGIERO, Gina Ruggiero, Midwest Bank and Trust Company, as Trustee under Trust Agreement dated July 1, 1988 and known as Trust No. 88–07–5534, and Hillside Cafe & Bar, Inc., Defendants-Appellants.

No. 91–2095.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1992.

Decided Oct. 7, 1992.

David L. Hazan, Randolph E. Ruff, William J. Raleigh (argued), Dehaan & Richter, Chicago, Ill., for plaintiff-appellee.

Gary P. Hollander (argued), Christopher L. Palanca, Bixby, Lechner & Potratz, Angelo Ruggiero, Chicago, Ill., for defendants-appellants.

Before CUDAHY, COFFEY, and RIPPLE, Circuit Judges.

COFFEY, Circuit Judge.

Angelo Ruggiero took out a $200,000 loan from Peoples Bank for Savings (Peoples Bank) in Libertyville, Illinois. Soon thereafter Peoples Bank went under and the Federal Savings and Loan Insurance Corporation was appointed receiver. To facilitate the liquidation of Peoples Bank, the Federal Home Loan Bank Board chartered Peoples Savings and Loan Association (Peoples Savings). Peoples Savings then executed a purchase and assumption transaction, taking over the assets and liabilities of Peoples Bank, including the right to collect the Ruggiero loan. 12 U.S.C. § 1823(c)(2). Before it could collect on the loan, Peoples Savings went into receivership, this time under the direction of the Resolution Trust Corporation (RTC). 12 U.S.C. § 1464(d)(2)(H)(ii). This case deals with RTC's efforts to collect on the loan, as well as Ruggiero's claim that he signed the note under economic duress, and should not be held liable for it. Alternatively, Ruggiero alleges that Peoples Bank promised that he would not have to repay the $200,000, and thus he should not be held responsible for it. We affirm.

## I. BACKGROUND [1]

■ In December of 1988, the Midwest Bank and Trust Company of Chicago owned, as Trustee, the land and building housing the Hillside Cafe & Bar in Hillside, Illinois. The beneficiary of the trust was Gina Ruggiero, wife of Angelo Ruggiero. Midwest Bank's ownership of this property was subject to a first mortgage held by National Republic Bank (National Republic) of Chicago, with Neptune Investments, Inc. (Neptune), also of Chicago, as the mortgagor.

Neptune was $200,000 in default on mortgage payments when Hiram Patel [2] of National Republic advised Angelo Ruggiero that the mortgage had to be removed

---

1. Because we are reviewing the district court's grant of summary judgment and dismissal of Ruggiero's affirmative defenses, we accept the defendants' factual allegations as true and draw all reasonable inferences in their favor. *See Prince v. Rescorp Realty*, 940 F.2d 1104, 1106 (7th Cir.1991).

2. The defendants claim that Patel was the president of National Republic, but RTC contends he was not. Patel's precise position is irrelevant to the outcome of this case.

from National Republic's records by the end of 1988 (or, presumably, National Republic would foreclose and the Ruggieros would lose the benefit of the trust). On December 27, 1988 Patel advised Ruggiero that he had spoken with representatives of the People's Bank who had agreed to loan him the $200,000 to satisfy the mortgage. Ruggiero then met with Patel and Peoples Bank president John Schnure to work out the details. According to Ruggiero, the parties at this meeting agreed: (1) that Peoples Bank would loan Ruggiero $200,-000 and he would be the obligor on the promissory note, which would be due sixty days after the loan was made; (2) that even though he was to sign the note as obligor, Ruggiero would not be personally responsible for it because, before the expiration of the sixty-day period, Peoples Bank would refinance the $200,000 as part of a much larger loan ($1.1 to $1.2 million) to Midwest Bank; (3) that if Peoples Bank failed to complete the refinancing arrangements within sixty days, National Republic would step in and repay the $200,000 loan to Peoples Bank; and (4) that the $200,000 loan would be made on December 30, 1988, enabling Ruggiero to meet National Republic's year-end deadline on the Neptune mortgage.

After the meeting Peoples Bank sent Ruggiero a $200,000 promissory note, which he signed and returned on December 29. This note did not contain any of the above conditions, despite his allegation that the parties agreed to these terms. Nevertheless, after signing the note Ruggiero forwarded it to the Bank, along with a letter reiterating the conditions outlined above; that is, the terms of the deal as he desired them to be. On the date of closing, December 30, when Ruggiero met with Peoples Bank president Schnure to receive the loan, Schnure informed him that Peoples Bank would not disburse the proceeds unless Ruggiero deleted from his letter all of the language inconsistent with the provisions of the note. Specifically, he was referring to the conditions expressed in Ruggiero's letter stating that Ruggiero would

not be personally liable on the note and that the $200,000 would be rolled into a refinanced loan. Obviously neither the Bank nor Schnure had ever agreed to these terms, as none of them were included in the note that Ruggiero, a practicing attorney, had already signed. Never having agreed to the terms in the letter, the Bank naturally wanted to prevent Ruggiero from unilaterally modifying the note at the last minute, and thus directed that he cross out the sections of the letter contradicting the note. Ruggiero claims that since this was the last business day of the year and he would be unable to get the money from another source before the year ended, the Bank knowingly forced him to acquiesce to its demand. He makes this claim despite the fact that the Bank's demand ought to have been expected, given that the modifications proposed in Ruggiero's letter were not included in the note. He and Schnure then initialled the changes, making it clear that the crossed-out terms in the letter could not be interpreted as anything but that both signatories to the note agreed to the specific language of the note on the date of their affixing their signatures thereto. At that time Ruggiero, without ever mentioning that he was being forced to modify his letter under duress, received the $200,000 from Peoples Bank, which he in turn used to pay off the Neptune mortgage at National Republic.

Despite the alleged agreement, the $200,-000 loan was not refinanced within sixty days, nor did National Republic step in to pay off the note when the planned refinancing fell through. Needless to say, Ruggiero did not pay off the note, and thus the RTC, the receiver for Peoples Savings, commenced this action to collect the debt. Ruggiero asserted affirmative defenses, charging that the note was invalid because it was signed as the result of economic duress, that National Republic had breached its agreement to pay off the debt, and that People's Bank had reneged on its promise to refinance the note as part of a larger loan.[3] RTC moved and the court

---

**3.** We note that Ruggiero did not raise the affirmative defense of economic duress until the filing of the second set of affirmative defenses, some twenty months after the execution of the

dismissed these defenses under Federal Rule of Civil Procedure 12(c). Initially, the court found as a matter of law that there was no merit to Ruggiero's claim of economic duress since Peoples Bank had not committed any wrongful act that put Ruggiero in a vulnerable economic position or gave him no choice but to sign the note on its terms. *See De Fontaine v. Passalino,* 222 Ill.App.3d 1018, 165 Ill.Dec. 499, 506–07, 584 N.E.2d 933, 940–41 (1991). Rather, the court found, Ruggiero's need to have the money by the end of the year was his problem, and his alone, as borrower, and was neither contributed to nor caused by Peoples Bank. The Bank had every right to refuse Ruggiero's attempt to revise the agreement, and he could not now, twenty months later, claim that the Bank's refusal to make the revisions, knowing of his need for the money, amounted to economic duress. Second, the court held that the other affirmative defenses were based on alleged side agreements that were insufficiently documented, and thus could not be asserted against the RTC under 12 U.S.C. § 1823(e). Ruggiero was unable to produce any written documents establishing either that National Republic had actually agreed to pay off the loan or that People's Bank had agreed to refinance the note. After answering Ruggiero's allegations and affirmative defenses, RTC moved for, and the court granted, summary judgment on the note.

## II. ISSUES

The issues before this court are: (1) whether economic duress may be used as a defense against RTC's claim on a promissory note, and if so, whether Ruggiero in fact has stated a claim for economic duress, and (2) whether certain documents in Peoples Bank's records prove an agreement shielding Ruggiero from responsibility for the $200,000 loan.

## III. DISCUSSION

▬ Ruggiero (a licensed, practicing attorney who originally served as the defen-

dants' attorney in this suit) initially contends that he should not be held liable on the note because Schnure forced him, at the last minute, to delete that portion of his letter recounting the agreement which stated that the parties had mutually agreed that he would not be made to answer for the money. Schnure did so, Ruggiero claims, by threatening to deny the loan unless he did as instructed, knowing that he had to have the money that day or he would be unable to satisfy the Neptune mortgage, and thus he and his wife would be forced to surrender their interest in the Hillside Cafe & Bar. Ruggiero maintains that but for his precarious financial position he would not have acceded to Schnure's demands, and that Schnure was well aware of this fact and took advantage of it. Thus, he argues, the note was executed under economic duress, and he should not be held to answer for it.

▬ Economic duress is a recognized affirmative defense to an action on a contract or note. *FDIC v. Linn,* 671 F.Supp. 547, 556 (N.D.Ill.1987). In Illinois,

> Economic duress is present where one is induced by a wrongful act of another to make a contract under circumstances which deprive him of the exercise of free will, and a contract executed under duress is voidable. . . . To establish duress, one must demonstrate that the threat has left the individual "bereft of the quality of mind essential to the making of a contract."

*Alexander v. Standard Oil Co.,* 97 Ill. App.3d 809, 53 Ill.Dec. 194, 198, 423 N.E.2d 578, 582 (1981) (citations omitted); *see also De Fontaine,* 165 Ill.Dec. at 501, 584 N.E.2d at 935; *Herget Nat'l Bank v. Theede,* 181 Ill.App.3d 1053, 130 Ill.Dec. 780, 782, 537 N.E.2d 1109, 1111 (1989). Of course, "[d]uress is not shown by the fact that one was subjected to . . . a difficult bargaining position or the pressure of financial circumstances." *Herget Nat'l Bank,* 130 Ill.Dec. at 783, 537 N.E.2d at

---

loan. In fact, Ruggiero never argued the theory of economic duress until he raised it before the

court more than a year after the loan had been called due by Peoples Bank.

1112; *Selmer Co. v. Blakeslee–Midwest Co.*, 704 F.2d 924, 928 (7th Cir.1983) ("The mere stress of business conditions will not constitute duress where the defendant was not responsible for the conditions."), quoting *Johnson, Drake & Piper, Inc. v. United States*, 209 Ct.Cl. 313, 531 F.2d 1037, 1042 (1976); *Linn*, 671 F.Supp. at 560 ("Defendants cannot blame [plaintiffs] for the pressures caused by defendants' own business decisions and by general economic conditions.") Further, the pressure applied must have been wrongful or unlawful; mere hard bargaining is not enough. *Linn*, 671 F.Supp. at 556, 559.

RTC maintains that Ruggiero cannot establish economic duress and, alternatively, that the affirmative defense of economic duress is barred by the doctrine established in *D'Oench, Duhme & Co. v. FDIC*, 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942) and codified at 12 U.S.C. § 1823(e). The question of whether *D'Oench* and § 1823(e) bar the defense of economic duress is an interesting one, but we need not reach it today because it is clear that Ruggiero was not a victim of economic duress.[4] First of all, there is no evidence to suggest that Peoples Bank is guilty of committing any type of wrongful act forcing him to sign the note or accept the Bank's terms. *Alexander*, 53 Ill.Dec. at 198, 423 N.E.2d at 582. Driving a hard bargain is not a wrongful act, especially in this case, where Peoples Bank had nothing to do with putting Ruggiero in a position where he needed the money by the end of the year. *See Selmer*, 704 F.2d at 928. Moreover, the mere fact that one is in a difficult bargaining position due to desperate financial circumstances does not support a defense of economic duress. *Herget Nat'l Bank*, 130 Ill.Dec. at 783, 537 N.E.2d at 1112. A borrower cannot charge a lender with economic duress where the pressures on the borrower are the result of his own business decisions and economic conditions. *Linn*, 671 F.Supp. at 560.

Further, Ruggiero's claim that Peoples Bank used economic duress to force him to delete the terms in his letter stating that he would not be personally accountable for the money is without merit. First of all, there is no evidence beyond Ruggiero's bald allegations that the Bank had ever agreed to the terms outlined in his letter. Second, the very terms in the letter were inconsistent with the note, and Peoples Bank had no reason, much less any obligation, to alter the terms of the note and make the new terms in the letter part of the agreement. Indeed, it takes quite a bold litigant (especially one with legal training) to assert that a lender's refusal to make a loan unless the borrower agrees to be held responsible for its repayment equals economic duress! The mere fact that a party to a contract is unable to obtain the terms he desires through negotiation does not mean that he can later attempt to avoid his obligations under the contract by claiming that he agreed to the contract (here, the loan note) under economic duress. *See Linn*, 671 F.Supp. at 559. If Ruggiero truly felt he was under duress he should have made it known to the Bank before signing the note, rather than later making unsubstantiated allegations that the parties actually had reached some agreement not expressed in the note. Finally, there can be no argument that Peoples Bank's demands left Ruggiero "bereft of the quality of mind essential to a contract." *Alexander*, 53 Ill.Dec. at 198, 423 N.E.2d at 582. As the district court noted, Ruggiero never raised the economic duress defense until the filing of his second set of affirmative defenses, some twenty months after signing the note and fourteen

---

**4.** At least one court takes the view that economic duress is not barred by *D'Oench* and § 1823(e) because they only bar defenses based on side agreements, *Commerce Federal Savings Bank v. FDIC*, 872 F.2d 1240, 1244 (6th Cir. 1989), whereas economic duress goes to the validity of the instrument itself, and does not depend on any collateral understanding. *Linn*, 671 F.Supp. at 555, citing *FDIC v. Powers*, 576

F.Supp. 1167, 1170 (N.D.Ill.1983) ("§ 1823(e) ... does not bar extrinsic proof that a written document in fact does not reflect any valid agreement."), *aff'd mem.*, 753 F.2d 1076 (7th Cir.1984); *but see Bell & Murphy & Assoc., Inc. v. Interfirst Bank Gateway, N.A.*, 894 F.2d 750, 754 (5th Cir.1990) (stating, without elaboration, that the presence or absence of economic duress was irrelevant to the applicability of *D'Oench* ).

months after Peoples Bank originally filed this suit in state court. He also failed to mention to anyone that he had felt coerced into modifying his letter until that time. To quote the district court, "To be quite blunt, the entire matter creates the strongly suspicious inference that Ruggiero ... is now asserting whatever seems necessary to escape from what Ruggiero himself did at the loan closing." 756 F.Supp. 1092, 1094 (N.D.Ill.1992).

In the alternative, Ruggiero makes the slightly different argument that the agreement he speaks of should be effective against RTC because it is included in the bank's records, meaning that RTC had notice of the conditions on his duty to pay and the alleged understanding of the parties. He points to three documents:

1. His December 29, 1988 letter to Peoples Bank stating that the $200,000 note would be refinanced and he would have no personal liability.

2. Peoples Bank Board of Directors minutes from January 19, 1989 indicating that Peoples Bank would participate in a refinanced loan up to $800,000.

3. A Peoples Bank Delinquency Report from March 31, 1989 referring to the $200,000 loan and indicating that National Republic, not Ruggiero, was to pay it off.

The problem with Ruggiero's reliance on these papers is that they fail to satisfy the requirements of § 1823(e). That statute mandates that agreements between a borrower and lender concerning a loan may not be used to defeat or diminish the RTC's interest in a bank's asset unless the agreement is: (1) in writing; (2) executed by the bank and borrower contemporaneously with the bank's acquisition of the asset; (3) approved by the bank's board of directors or loan committee, as reflected in that body's minutes; and (4) has been, since its execution, an official record of the bank.[5] *FDIC v. O'Neil,* 809 F.2d 350, 351 (7th Cir.1987). Even if we assume for the sake of argument that the writings referred to above (the letter, minutes, and Delinquency Report) evidence an agreement, it is clear that they were not executed by both parties, officially approved by Bank officers, reflected in the Bank's official minutes, or made an official bank record.

First of all, it is a fact that Ruggiero's letter was modified at the loan closing meeting with the striking of the key portions of the letter which he relies on as proof of the agreement. The Bank requested that Ruggiero delete these portions of the letter because they were flatly inconsistent with the terms of the note he had executed. Both parties initialled this change, barring the addition of Ruggiero's proposed terms to the parties' agreement. Thus, the arguably "executed" form of the letter, the form that might be used under § 1823(e), makes no mention of the agreement Ruggiero alleges, as the portion relieving Ruggiero from personal responsibility had been crossed out and initialled by both parties. Thus, on reading the letter, the RTC would not have believed that it qualified or restricted Ruggiero's duty to pay.[6]

5. In its full form, § 1823(e) reads as follows:

**(e) Agreements against interests of Corporation** [FDIC or RTC]

No agreement which tends to diminish or defeat the interest of the Corporation in any asset acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless the agreement—

(1) is in writing,

(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,

(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.

6. And if there had been no alteration of the letter, so that Ruggiero's terms were included in a writing in the bank's records, § 1823(e) would still not be satisfied because the letter would not have been "executed" by the bank. *See Twin Construction, Inc. v. Boca Raton, Inc.,* 925 F.2d 378, 384 (11th Cir.1991) ("In the context of section 1823(e)(2), 'executed' must mean that the depository institution has 'signed' the agree-

Second, the statements in the Board of Directors' minutes indicating that Peoples Bank would participate in a refinanced loan were only part of a draft set of minutes, and were not included in the final, official Board minutes. While § 1823(e)(3) merely says that the board's approval of an agreement "shall be reflected in the minutes of said board," the statute must be read as referring to *official* minutes: "A second purpose of § 1823(e) is implicit in its requirement that the 'agreement' ... become a bank record 'contemporaneously' with the making of the note and have been approved by *officially recorded action* of the bank's board or loan committee." *Langley v. FDIC*, 484 U.S. 86, 92, 108 S.Ct. 396, 399, 98 L.Ed.2d 340 (1987) (emphasis added). Unofficial actions by a bank's directors cannot be used as a defense against the RTC. For example, in *FSLIC v. Two Rivers Assoc., Inc.*, 880 F.2d 1267, 1276 (11th Cir.1989), the borrower sent a letter to the lender conditioning its acceptance of a loan on the lender's agreement to provide future financing of $550,000 to construct four buildings. The parties then amended their agreement, superseding all prior agreements. The amendment made no mention of the lender's duty to provide future financing. Nevertheless, the borrower argued that the lender had implicitly agreed to provide future financing by stating that it agreed to provide a "Construction Loan Commitment." The court disagreed with the borrower, holding that the lender had only agreed to provide some future financing, not specific amounts directed to specific projects. *Id.* at 1275. Since the ambiguous agreement to provide a "Construction Loan Commitment" would not have given the FSLIC adequate notice of the alleged obligation to fund the construction of four buildings, the borrower could not use the lender's failure to provide funding for the buildings as a defense against the FSLIC. *Id.* at 1276. The situation here is similar; Peoples Bank's directors never agreed to participate in refi-

nancing the loan to Ruggiero. The topic may have been discussed, but no agreement was ever put into writing, or executed by the bank and borrower, or approved by the board of directors, much less made an official bank record. Thus, Ruggiero cannot use the Bank's failure to refinance his loan as a defense against the RTC.

Finally, the delinquency notice was not executed "contemporaneously with the acquisition of the asset" as § 1823(e)(2) requires; it was completed three months later. Had the parties agreed that National Republic would return the $200,000 if the refinancing could not be completed within sixty days, they would have had to reduce the agreement to writing at the time the loan was made in order for Ruggiero to now use the alleged agreement as a defense against the RTC.[7] *See Bell & Murphy*, 894 F.2d at 754 ("Bell & Murphy could have protected itself by insisting that the bank properly record the agreement."); *FDIC v. Virginia Crossings Partnership*, 909 F.2d 306, 309–10 (8th Cir.1990) (discussing the contemporaneity requirement). The whole point of *D'Oench*, and § 1823(e) is that such alleged secret oral side agreements may not defeat the RTC or FDIC's interest in a facially valid instrument; if there are conditions on repayment, they must be plainly agreed to, documented, and memorialized up front for everyone (including, especially, the bank examiners) to see. *Bowen v. FDIC*, 915 F.2d 1013, 1016 (5th Cir.1990) ("Simply put, transactions not reflected on the bank's books do not appear on the judicial radar screen either.")

We agree with the district court's decision to dismiss Ruggiero's affirmative defenses and enter summary judgment in favor of the RTC. His attempt to claim economic duress is, at best, disingenuous: he wanted the loan, he just refuses to acknowledge and comply with the terms he had accepted; specifically, that he would be personally responsible for its repayment. Indeed, the essence of his claim is that the

ment. That a piece of paper [i.e., a letter signed by one party] merely recites obligations of more than one party is insufficient to prevent the FSLIC's use of *D'Oench* and section 1823(e).")

7. We also note that the delinquency notice was neither executed by the defendants nor approved by the bank's directors or loan committee.

banks breached an alleged undocumented side agreement, a meritless defense clearly rejected by numerous decisions, beginning with *D'Oench* itself. His fallback position—that documents in the bank's records prove the alleged agreement—is similarly unavailing, as none of the documents passes the test of § 1823(e). The decision of the district court is AFFIRMED.